Afriquita L. PETERSON, Petitioner,

v.

ENT FEDERAL CREDIT UNION, Colorado Compensation Insurance Authority, and The Industrial Claim Appeals Office of the State of Colorado, Respondents.

No. 91CA0323.

Colorado Court of Appeals, Div. II.

Feb. 27, 1992.

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1988 Repl.Vol. 10B).

Cornish and Dell'Olio, Donna Dell'Olio, Colorado Springs, for petitioner.

John Berry, Denver, for respondents ENT Federal Credit Union and Colorado Compensation Ins. Authority.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John R. Parsons, Asst. Atty. Gen., Denver, for Respondent Indus. Claim Appeals Office.

Opinion by Judge ROTHENBERG.

Afriquita L. Peterson (claimant) petitions for review of a final order of the Industrial Claim Appeals Panel denying and dismissing her claim for workers' compensation benefits based on a stress-related disability. We set aside the order and remand with directions.

The relevant facts are largely undisputed. In 1987, Peterson was a 59–year–old supervisory employee (lead teller) of the ENT Federal Credit Union, assigned to the Peterson Field branch. She worked for the credit union at that branch for 14 years and had intended to work for three more years before retiring. Because of her long tenure with the credit union, Peterson had established long standing relationships and friendships with the customers and co-workers of the Peterson Field branch.

In early 1987, Peterson learned that management had concluded that the rotation of employees would improve security and that she was going to be rotated away from the Peterson Field branch where she had worked throughout her career with the credit union. She began to suffer extreme emotional distress soon after learning of the decision.

Throughout her work life, Peterson had left all previous positions with commendations from her employees. At her lead teller job at the credit union, she consistently received the highest ratings on her job performance evaluations from the credit union. The ALJ found that Peterson's ability to perform her responsibilities "had only mildly been questioned prior to the announcement of the rotation system." She had never received any written counseling regarding her job performance, which was the credit union's required procedure if any employee's job performance was deficient. Also, Peterson had no history of psychiatric problems whatsoever before she was moved from the Peterson Field branch.

Witnesses who had known Peterson for many years testified that she was "likable, helpful, very friendly, and conscientious" until she learned of the rotation and then was moved from the Peterson Field branch. According to her direct supervisor, after Peterson learned that she was going to be moved, "it seemed like she lost her mind ... [S]he was in a different world...."

In July 1987, Peterson was transferred to the Bon branch. According to the branch manager at the Bon branch, Peterson soon "was having difficulty performing her job because she was distraught over the transfer." Her job performance "declined substantially," and after only two weeks there, the ALJ found that she "was unable to fulfill her job responsibilities" and that her "inability to perform adequately was due to her unhappiness with the rotation transfer."

After two months at the Bon branch, Peterson was transferred to a third branch. The ALJ found that Peterson became "confused regarding certain procedures and was unable to help the tellers as she should have done." This was true even though Peterson's job responsibilities had not changed and she had previously received excellent ratings from her supervisor at the Peterson branch.

On November 6, 1987, Peterson was so emotionally upset she could no longer work, and she was excused from work by her physician.

On November 9, 1987, Peterson was notified that she had been demoted with a substantial loss of wages. Peterson then applied for job related psychiatric disability benefits under the Colorado Workers' Compensation Act, § 8–52–102(2), C.R.S. (1986 Repl.Vol. 3B). Following a hearing, the ALJ found that her claim was barred by §§ 8–52–102(2)(b) and (c), C.R.S. (1986 Repl. Vol. 3B). The Panel affirmed.

### I.

■ Peterson first contends that the Panel erred in concluding that she had failed to meet her burden of proof with respect to the pertinent statute. We agree.

Initially, we note that the General Assembly made significant changes in the workers' compensation statute in 1991. *See* §§ 8–41–301(2)(a), (b), and (c), C.R.S. (1991 Cum.Supp.) ("a mental impairment shall not be considered to arise out of and in the course of employment if it results from … a job transfer…."; also, mental impairment must "evoke significant symptoms of distress in a worker in similar circumstances").

However, since Peterson's claim arose in 1987, § 8–52–102(2)(b), C.R.S. (1986 Repl. Vol. 3B) was then in effect, and it stated:

> The emotional or mental stress which is the basis of the claim must have arisen primarily from the claimant's then occupation and place of employment.

The purpose of this provision was to prevent a claimant from recovering for stress under the Act when the stress was not work related. *See Industrial Commission v. Newton Lumber & Manufacturing Co.,* 135 Colo. 594, 314 P.2d 297 (1957). Thus, Peterson had the initial burden of proving that the stress was caused by a work-related event, rather than a personal event.

The undisputed testimony was that during Peterson's fourteen years with the credit union, she consistently received outstanding job performance evaluations and rarely, if ever, used sick leave before 1987 when the rotation occurred. There was no evidence that Peterson's stress was caused by any non-work related event.

Here, relying on the report of a psychologist hired by respondent who saw Peterson after the demotion, the ALJ found that Peterson "suffered emotional distress the etiology of which lies *primarily* in her long standing personality disorder." (emphasis in original) However, even if we assume this diagnosis was correct, there was no evidence presented that this previously undiagnosed disease had ever prevented Peterson from working or had interfered with her positive job performance for the fourteen years before the rotation was announced. In sum, there was no testimony whatsoever that Peterson's stress was caused by any non-work related event.

■ To the contrary, the uncontradicted testimony was that Peterson was a 59–year–old woman who had been happily married for 37 years, had raised four children to adulthood, and had functioned well within the range of normal at home and at her job until she was rotated by the credit union and suffered this job-related stress. Thus, the existence of a latent tendency was irrelevant here, *see Industrial Commission v. Newton Lumber & Manufacturing Co., supra* (compensation not dependent on employee's freedom from latent tendency), and the ALJ's determination that Peterson's claim was barred by § 8–52–102(2)(b) is wholly unsupported by the record. *See Stearns–Roger Corp. v. Industrial Commission,* 517 P.2d 868 (Colo. App.1974) (not selected for official publication).

### II.

■ Peterson's second contention is that the ALJ and the Panel erred in concluding that her rotation was based in whole or in part upon circumstances "common to all fields of employment." Again we agree.

Section 8–52–102(2)(c), C.R.S. (1986 Repl. Vol. 3B) then in effect provided that:

The claim of emotional or mental stress cannot be based, in whole or in part, upon facts and circumstances that are common to all fields of employment. . . .

Here, there was no evidence that rotation was a common practice in the credit union industry, much less common in *all* fields of employment. Rather, to the contrary, the evidence in the record showed the rotation of employees was uncommon in the credit union industry.

More specifically, Peterson's supervisor testified that it was not customary to rotate employees. Also, the president of the credit union testified that of the twelve or thirteen credit unions in Colorado Springs, only one other credit union rotated its employees. Another witness testified that the rotation of employees was not a condition of employment common to all financial institutions.

Another witness who was a senior risk management specialist for the bonding company which underwrote the fidelity bond for Peterson's employer testified that the rotation of employees was not customary in the credit union industry.

Also, the ALJ found that one witness was "impressed by the system of rotating employees from branch [sic] as an internal security control mechanism [and] [the credit union] was often on the 'cutting edge of change and innovation in the credit union industry'." We note that this finding is inconsistent with the respondents' contention that rotating employees was "a common practice in the credit union industry."

Finally, the ALJ's finding that the rotation of employees was not "an unusual or extraordinary managerial practice" does not satisfy the statutory test which is whether rotation was a practice common to all fields of employment. Similarly, although the ALJ found that "changes in operating procedures" are common to all fields of employment, this again is not the dispositive issue which is whether the rotation or transfer of employees was a common practice in all fields of employment.

Simply stated, we find no record support for the ALJ and Panel's conclusion that respondents' system of rotating credit un-

ion employees was a common practice in the credit union industry, much less a practice common to all fields of employment. If there is no substantial evidence to support the findings and conclusions of the Panel, we are not bound by them. *See Arteaga v. Industrial Claim Appeals Office*, 781 P.2d 98 (Colo.App.1989).

In so ruling, we recognize that there was dictum in *Holme, Roberts & Owen v. Industrial Claim Appeals Office*, 800 P.2d 1332 (Colo.App.1990) which suggests that a job transfer is a condition "generally inherent" in every work situation and therefore common to all fields of employment. However, that case did not involve a job transfer or rotation. Rather, it involved a job demotion and is therefore distinguishable from Peterson's case. Nevertheless, to the extent that the dictum in *Holme, Roberts* is inconsistent with this conclusion, we decline to follow it.

We find additional support for our conclusion here, in the 1991 changes to the statute noted previously in which the General Assembly has now specified that a mental impairment is not compensable if, *inter alia*, it results from a job transfer. *See* § 8–41–301(2)(a), C.R.S. (1991 Cum. Supp.). Since this specific language was absent from the statute which governs Peterson's claim for benefits, it is reasonable to conclude that the General Assembly did not intend to preclude benefits for all job transfers occurring before the 1991 amendment took effect. *See In re Fort Lupton Park & Recreation District*, 800 P.2d 1324 (Colo.App.1990) (when a statute is amended, an intent to change the law is generally presumed).

The order is set aside, and the cause is remanded with directions to enter an order finding that Peterson's injury is compensable.

TURSI and JONES, JJ., concur.